No. 3011.

JOHN BREEDLOVE *v*. THE STATE.

1. MURDER—MANSLAUGHTER—CHARGE OF THE COURT.—If, in an attempt to kill a certain person the slayer, through mistake, kills another person, the homicide thus committed can not be of a higher grade than murder of the second degree. If, however, the slayer had killed the person he intended to kill, and such killing, under the circumstances surrounding it, would be manslaughter, then the killing of a third person by mistake, believing him to be the person intended, would be manslaughter. The facts of this case show that, had the defendant killed the person intended, such killing would have been murder of the

first degree. The evidence, therefore, does not raise the issue of man-slaughter, and in omitting to instruct the jury upon that issue the trial court did not err.

2. SAME—PRACTICE—EVIDENCE—FACT CASE.—The proof being that the deceas-d and one King were sitting in juxtaposition when the fatal shot was fired from ambush, and the theory of the State being that the defendant fired the said shot from a gun secured by him from the house of one Frances Graybill, on the evening of the homicide, the defense objected that the State should have been compelled to produce or account for the testimony of King and said Frances as the best evidence in the case—King being present when deceased received the wound and Frances Graybill being at home, as shown by the proof, when the defendant arrived at the house shortly before the killing. But *held* that, the proof failing to show that King could testify to any material fact, and showing that Frances Graybill was absent from her house after the arrival of the defendant long enough for him to have taken the gun without her knowledge, the objection is without merit. See the statement of the case for evidence *held*, though circumstantial, to be sufficient to support a conviction for murder in the second degree.

APPEAL from the District Court of Smith. Tried below before the Hon. F. J. McCord.

The appellant in this case was convicted in the second degree for the murder of Isham Amos, in Smith county, Texas, on the twenty-sixth day of July, 1888. A term of five years in the penitentiary was the penalty assessed by the verdict.

Caleb Cooper was the first witness for the State. He testified that he lived in Smith county, Texas, in a house of three rooms, the gallery of which fronts east. The deceased was shot on the said gallery on the night of July 26, 1888, and died within fifteen minutes thereafter in the kitchen of the said house. The deceased, who was a mill hand employed at Smith's mills, about two miles distant from witness's house, came to the witness's house on that night for the purpose of accompanying the witness to the city of Tyler. The shooting occurred at about good dark, at which time the deceased and one Willis King were sitting near each other on the gallery, the seat of the deceased being the nearest to the southeast corner of the same. When the witness left the said parties on the gallery, he went into his kitchen to help a little girl clear off the supper table, his wife at the time being in her room sick. While he was in the kitchen he heard the report of a gun fired from some point near the house, followed by the screams of his wife. He ran to the gallery at once, taking that route to go to his wife's room, and

met King and deceased going towards the kitchen door, the latter holding both hands to his breast, and ejaculating: "Oh! Oh! Oh!" Without stopping, the witness continued to his wife's room, fearing that she had been hurt. He found her unhurt, but much frightened, excited and crying. It took him about fifteen minutes to compose her, when he went back to the kitchen and found the dead body of the deceased lying in one corner of the same, perforated with buck shot. The witness at once saddled his mule and started off to summon help. He went first to the house of Mansur Graybill, about half a mile southwest from his, witness's house. Not finding Mansur at home, he went to defendant's house, about three hundred yards distant from Mansur's house, and, not finding defendant at home, he started on to the house of Guy Everhart, about half a mile beyond Graybill's house. Upon reaching a point within about four hundred yards of Everhart's house, the witness met the defendant and Mansur Graybill, walking, and the latter's children riding a mule, all going towards their respective homes from the direction of Everhart's house. Witness stopped the said parties and told them that Isham Amos had just been killed at his, witness's, house. Defendant said, in a questioning manner: "Isham Amos?" Witness replied: "Yes, Isham Amos." Witness then asked the defendant to go back to Everhart's house and either get Everhart to go after Justice of the Peace Butler, or borrow a mule from Everhart and go himself after the said Butler. Defendant agreed to do as witness requested, and went back towards Everhart's house, but he did not come to witness's house until he was brought there the next day under arrest. The witness and Mansur Graybill then went back to Graybill's house, where the children were left, and thence they went to witness's house.

Early on the next morning the witness and others instituted a search of the premises and vicinity for traces of the assassin. They found the foot tracks of a man at a corner of the witness's smoke house, twenty-five or thirty steps distant from the gallery, at which said point the grass and weeds were trampled down. They also found fragments of gun wadding on the ground, at intervals, between the said corner of the smoke house and the southeast corner of the gallery. The tracks mentioned led off from the said corner of the smoke house in a north direction, alongside of a fence, until they reached a road about one hundred yards distant, whence,

crossing the road, the tracks went in a westerly direction until they reached the woods, into which they could not be followed nor traced. As the witness could now best estimate time, not more than thirty minutes after the shooting had elapsed when he started off after help, and he was not gone longer than twenty minutes when he met the defendant and Mansur Graybill near Everhart's house. The witness was the only male person living at his house, but Willis King, who was helping witness pull fodder, was at the house, and had been, to the knowledge of defendant, for several days before the killing. Deceased was shot in the arm two or three months prior to his death, but witness did not know by whom nor under what circumstances.

John Jackson testified, for the State, that, on the twenty-sixth day of July, 1888, on the night of which day the killing occurred, Mansur Graybill, defendant and witness were pulling fodder for Guy Everhart in Everhart's corn field. Having pulled to a certain point in the field, Everhart and Mansur remarked that the fodder at that point was too green to be pulled, and they left witness and defendant and went to another point in the field to examine the condition of the fodder there. During the absence of Mansur and Everhart, the witness and defendant got into a conversation about marriage, in the course of which the witness remarked that if he ever did get married he would be careful not to marry such a woman as defendant's wife, who, on the day previous, he saw copulating with Willis King. Defendant then went off to join Mansur Graybill and Everhart. After some talk with them he called the witness, and when the witness reached them he said to witness: "I want you to tell these men what you have just told me." Witness repeated, in the presence of the said parties, that he saw Willis King and the defendant's wife copulating on the day before. Defendant then asked witness if he could point out the place where the act of copulation took place. Replying that he could, the witness piloted him to a point in the grass near a small branch in that part of the field where the defendant's wife worked on the day before, and he indicated a certain place, which the defendant examined closely, and then remarked that he was satisfied of the truth of the witness's statement, as the impress of his wife's heel on the ground was plain. He then left witness and went off toward the house in which his wife lived. The witness went back and pulled fodder until dark, when he and the remaining parties went to Everhart's house,

arriving after dark. Supper was not yet ready, and had to be cooked. After the supper was cooked and placed upon the table, witness, Everhart and Graybill sat down and ate, and, just as they had finished and were leaving the table, the defendant stepped into the house. Everhart insisted that defendant should eat some supper. He finally went into the dining room, but remained only a short time. After finishing supper and leaving the table, Graybill told his children to get ready to go home with him. Defendant, who was then at the supper table, called to Graybill to wait a few minutes and he would go with him. Graybill told the defendant to make haste, and defendant soon came out, and he and Graybill, walking, and Graybill's children riding the mule, started off toward their respective homes, which were in the same direction from Everhart's house. They had been gone a very short time when the defendant came back and reported the killing of deceased at Cooper's house. He then asked Everhart either to go after Justice Butler or lend him a mule to go. Everhart replied that he could do neither, as his mules had been worked hard and were very tired. Defendant then asked witness to go with him. Witness went with him as far as the house in which his, defendant's, wife lived, when defendant stopped, and witness went on to Graybill's house, and thence to Cooper's house. Defendant did not go to Cooper's on that night, nor on the next day until he was taken there in arrest.

Harvey Lynch testified, for the State, that he lived at the house of Willis Jackson, about a mile and a half distant from the house of Caleb Cooper. Witness left home on the morning of July 26, 1888, and did not get back until after night, when he was told of the killing, and went to Cooper's house, and remained with the body, which he helped to wash and dress on the next day. Deceased was struck in three or four places with buckshot, one of which the witness extracted from a place under the skin where it had lodged after passing entirely through the body. The witness was one of the parties who, early on the next morning, examined the ground for traces of the assassin. The tracks of a man were found at the corner of Cooper's smoke house, at which point the grass and weeds were mashed down, apparently by some person who had stood or squatted there. Some of the weeds appeared to have been cut with a knife. From the said corner of the smoke house the

tracks, following a fence, led off in a north direction until they reached a road about one hundred yards distant from the house. Crossing the road at that point, they went west until they struck the woods, beyond which point they could not be traced. About sun rise on the next morning, the defendant's dog came to Cooper's house from the direction of the defendant's house, which was southwest from Cooper's house. That dog came up the road with his muzzle near the ground, as if following a trail, and followed that course until it had very nearly reached the point at the corner of the smoke house near which the tracks were found. He was hallooed at and frightened off by Mr. Fonzo Butler, just before he reached the said corner, and went back over the same route he had just come, towards the defendant's home. The witness knew that dog well, and knew him to be good at trailing game. He would also trail people. The dog was in the habit of trailing up and finding the defendant whenever the defendant would get away from him. Witness had often seen him tracking defendant. In trailing an object, that dog traveled with his head very close to the ground. The said dog was very much afraid of white people, and for that reason, as the witness supposed, it fled when Mr. Butler hallooed at him. The witness and the defendant were together at the house of Mr. Henry Butler, the justice of the peace, a week or two prior to the killing, on which occasion the defendant, in the hearing of the witness, asked Mr. Butler several questions about what a man could lawfully do to men who came about his house after his wife. Butler told him that he had the right to drive such fellows off, and could use force enough to do so, but that he had better not molest anybody unless they came to his house and interfered with him or his wife. Witness saw the defendant's double barreled shot gun on the morning after the killing. The right hand barrel, as shown by indications at the muzzle and tube, had been recently discharged. The left hand tube was broken. The defendant's dog was very much attached to him, and would track and find defendant as often as he missed him. He was on the track of the man who stood at Cooper's smoke house corner, when he was frightened off by Mr. Butler. Witness knew that the deceased was shot some time before he was killed, but knew who shot him only by hearsay.

Mansur Graybill was the next witness for the State. He testified that he lived in a house about half a mile southwest from

Cooper's house, and about the same distance north from Ever-hart's house.   The witness and defendant and one John Jack-son pulled fodder together in Everhart's corn field on the day of the killing.   About an hour before sun set on that evening, the defendant came to where witness and Everhart were at work, in the said field, and said to them:   " Men, there has been some-thing going wrong I want you all to know."   He then called John Jackson to where the parties were, and told him to repeat his recent statement made to him, defendant, whereupon Jack-son said that on the day previous he saw Willis King and the defendant's wife copulating with each other.   Defendant there-upon asked Jackson to point out to him the place where the act of copulation took place, and defendant and Jackson went off to-gether towards a branch in the field.   The witness, Guy Ever-hart and John Jackson quit pulling fodder about dark, and went to Everhart's house to get supper.   They sat down to the supper table about an hour or two after night, and were just leaving the table after eating when the defendant arrived. Everhart invited the defendant to take supper, and, just as de-fendant went into the dining room, the witness called to his children that he was ready to go home.   Defendant thereupon called to witness to wait a minute and he would go with him. Witness told him to hurry, and he reappeared in a very short time, and together with witness and his children started home. When they reached a point three or four hundred yards distant from Everhart's house, they met Caleb Cooper, who told them that Isham Amos had been recently killed at his house.   De-fendant, in a surprised and questioning manner, asked: "Isham Amos?"   Cooper replied:   "Yes, Isham Amos," and asked that either witness or defendant go after Justice Butler.   After some talk defendant agreed to go back to Everhart's and get him to go, or borrow one of Everhart's mules and go himself.   He then turned and went back towards Everhart's house, and witness did not see him again until after his arrest on the next day. Defendant had a double barreled shot gun which he kept at the house of the witness.   He was in the habit of going to the said house at will and getting the said gun.   He used the gun to kill squirrels on the Monday of the week preceding the homi-cide, but witness could not say whether on that occasion he used one or both barrels.   Witness examined the said gun on the morning after the homicide, and found that the right hand barrel had been recently discharged.   The tube on the left hand

barrel was broken, and witness did not know whether or not
that barrel could be fired.   About a week before the killing of
Amos, the defendant asked witness for some buck shot, and
witness told him where he could find them.   He could have got
the buck shot, but witness could not say whether he did or not.
The defendant's gun was at witness's house when the witness
left home on the morning of the fatal day.   He did not know
whether or not it was there when he got back on that night.
Witness left his wife at home in the morning, and found her at
home when he got back.  He knew nothing about her remaining
at the house all day except what she told him.

Guy Everhart, the next witness for the State, testified as did
the witness Graybill, up to the point at which the defendant and
Jackson left his house, on the fatal night, to go after Justice of
the Peace Butler, except that he was not with Graybill and de-
fendant when they met Cooper and were informed by him of
the killing of deceased.

George Davenport, the brother of Frances Graybill (wife of
the witness Mansur Graybill), testified, for the State, that he
and defendant went to Graybill's house together about sun
down on the fatal evening.   When the witness started home, a
few minutes later, his sister Frances got her milk bucket and
went with him as far as the cow pen, about two hundred yards
from the house.   When witness and Frances left the house,
defendant was standing at Graybill's gate.  When they reached
the cow pen witness looked back towards the house, but de-
fendant had left the gate, and was nowhere in sight.

No evidence appears to have been introduced by the de-
fendant.

*C. G. White*, for appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE.  On the evening of July 26, 1888, about
good dark, at the house of Caleb Cooper, in Smith county,
Isham Amos was shot and killed by some person.   At the time
deceased was shot he was sitting on the gallery of the house in
company with one Willis King.   He was shot with buck shot
and lived but a few moments after being shot.   It is very clear
from the evidence that whoever did the shooting lay in wait
for that purpose, and perpetrated the deed with a cool, sedate

mind and a formed design to kill. The physical indications at the place of the killing showed convincingly that the person who fired the fatal shot, at the time of firing, stood at the corner of Cooper's smoke house, at a distance from deceased of twenty-five or thirty steps, and at the place where he stood the weeds had been tramped down, and some appeared to have been cut with a knife. Unquestionably the homicide was a deliberate assassination, and the evidence rebuts and absolutely repels the theory of manslaughter contended for by appellant's counsel.

If Isham Amos was killed through mistake, the slayer believing him to be Willis King, whom he intended to kill, the homicide is of no higher grade than murder in the second degree, and if the killing of King, had he been killed, would have been manslaughter only, then the killing of Amos, believing him to be King, would be manslaughter only. But, if King had been killed instead of Amos, and killed by the defendant, shortly after the defendant had been informed and convinced that said King had had carnal intercourse with his, the defendant's, wife, such killing, under the facts of this case, would have been murder in the first degree. It could not have been manslaughter, because the evidence shows that in committing the homicide his mind was cool, sedate, and deliberate. He prepared himself with a weapon, traveled a half mile or more, secreted himself in a convenient place, and waylaid his intended victim. He was not acting under the influence of sudden passion. We are of the opinion, therefore, that the facts of the case did not demand or warrant a charge upon the law of manslaughter.

It is insisted by counsel for appellant that the evidence is insufficient to support the conviction. We think otherwise. Notwithstanding the evidence is circumstantial, it is, to our minds, quite conclusive of the defendant's guilt, and fills the requirements of the law.

It is objected by appellant's counsel that the best evidence of the defendant's guilt was not produced nor its absence accounted for by the State—that is, the testimony of Willis King and of Frances Graybill. This objection is not maintainable. It does not appear that Willis King's testimony would have shed any light upon the transaction. It is not probable that he saw or knew who did the shooting, or that he knew any fact which would have aided the jury in arriving at the truth. With respect to Frances Graybill, the wife of Mansur Graybill,

the evidence shows that she was absent from her house, where defendant's gun was, long enough for him to have taken the gun away from the house without her knowing it, and it does not appear from the evidence that she knew any fact, or probably knew any fact, which would be better evidence than that which was adduced upon the trial.

We perceive no error in the conviction, and the judgment is affirmed.

*Affirmed.*